UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                                        :
PEDRO ANTONIO ORTIZ                                     :    3:18 CV 1996 (RMS)
                                                        :
V.                                                      :
                                                        :
COMMISSIONER                                            :
OF SOCIAL SECURITY                                      :    DATE: JAN. 7, 2020
                                                        :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A
HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"] and supplemental security income benefits ["SSI"].

I.  ADMINISTRATIVE PROCEEDINGS

On October 27, 2015, the plaintiff filed applications for SSDI and SSI, claiming that he had been disabled since October 23, 2013, due herniated discs and diabetes. (*See* Certified Transcript of Administrative Proceedings, dated February 6, 2019 ["Tr."] 293-310, 341). The plaintiff's applications were denied initially and upon reconsideration. (Tr. 129-30, 151-52). On July 11, 2017, a hearing was held before Administrative Law Judge ["ALJ"] Eskunder Boyd at which the plaintiff and a vocational expert testified. (Tr. 79-114). On August 10, 2017, the ALJ entered a partially favorable decision finding that the plaintiff had performed substantial gainful activity until January 1, 2015 but was disabled from that date through the date of his decision. (Tr. 153-65). On October 6, 2017, the Appeals Council issued its Notice of Appeals Council Action (Tr. 229-37), and on March 23, 2018, the Appeals Council remanded the case back to the ALJ.

(Tr. 170-76). The ALJ held a second hearing on August 6, 2018, at which the plaintiff and another vocational expert testified. (Tr. 34-78). On August 22, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 7-20). The plaintiff filed a request for review of the hearing decision (Tr. 290-92), and on October 10, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On December 6, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on February 7, 2019, the defendant filed a certified copy of the Administrative Record. (Doc. No. 15). On March 6, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred accordingly. (Doc. No. 18). On April 8, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 19), with brief (Doc. No. 19-1 ["Pl.'s Mem."]), and Statement of Material Facts (Doc. No. 21; *see* Doc. No. 20) in support. On June 7, 2019, the defendant filed his Motion to Affirm (Doc. No. 22), with brief (Doc. No. 22-1 ["Def.'s Mem."]) and a Statement of Material Facts (Doc. No. 22-2) in support. On June 21, 2019, the plaintiff filed a reply brief. (Doc. No. 23).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 19) is GRANTED such that this case is remanded consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 22) is DENIED.

II. <u>FACTUAL BACKGROUND</u>

The Court presumes the parties' familiarity with the plaintiff's medical and work history, which is thoroughly discussed in the parties' Statement of Facts. (Doc. Nos. 21, 22-2). The Court cites only to the portions of the record that are necessary to explain this ruling.

III. <u>THE ALJ'S DECISION</u>

Following the five-step evaluation process,[1] the ALJ found that the plaintiff met the insured status requirements through December 31, 2019 (Tr. 13) and has not engaged in substantial gainful activity since October 23, 2013, the alleged onset date. (Tr. 13, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: plantar fasciitis, chronic right knee instability, multilevel degenerative disc disease, diabetes, and peripheral neuropathy (Tr. 13, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he could stand/walk up to four hours total and sit for six hours; he required a sit-stand option wherein he could sit for 30 minutes, alternate to a standing position for five minutes, and then resume sitting; and he could not use his lower extremities to operate foot controls and should never climb ladders,

---

[1] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

ropes, scaffolds, or stairs. (Tr. 14-18). Additionally, he could occasionally climb ramps, balance, stoop, and crouch and should never kneel or crawl. (*Id.*). He could frequently handle and finger and should not work in exposure to temperature extremes or wetness. (*Id.*). Additionally, the plaintiff required the use of a cane for ambulation. (*Id.*).

At step four, the ALJ concluded that the plaintiff was unable to perform any of his past relevant work (Tr. 18, citing 20 C.F.R. §§ 404.1565 and 416.965), but he retained the RFC to perform other work. (Tr. 30, citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). The ALJ considered the vocational expert's testimony that a person with the RFC adopted by the ALJ could have performed the work of a "[p]arking [l]ot [a]ttendant[,]" "[t]icket [s]eller [,]" and "[p]hotocopy [m]achine[]" operator. (Tr. 19). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from October 23, 2013, through the date of his decision. (Tr. 31, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

4

Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff argues that the ALJ's RFC finding was unsupported by substantial evidence because he failed to analyze properly Dr. Seely's opinion evidence in accordance with the Regulations. (Pl.'s Mem. at 3-8; Doc. No. 23, at 1-2). Similarly, the plaintiff claims that the ALJ's RFC finding failed to consider adequately the symptoms of the plaintiff's diabetes and neuropathy, which the ALJ concluded were severe impairments. (Pl.'s Mem. at 8-10). Finally, the plaintiff maintains that, in formulating the RFC, the ALJ failed to develop the record as ordered by the Appeals Council. (Pl.'s Mem. at 10-12).

Addressing the plaintiff's last argument first, the Court agrees and concludes that the ALJ failed to comply with the Appeals Council's remand order to develop the record. This error was compounded by the ALJ's improper treatment and analysis of Dr. Seely's opinion. As a result, a remand is required.

    A.    <u>THE ALJ FAILED TO COMPLY WITH THE APPEALS COUNCIL'S REMAND ORDER AND FAILED TO DEVELOP THE RECORD</u>

On March 23, 2018, the Appeals Council issued its notice remanding the case to the ALJ ["Remand Order"]. (Tr. 170-76). In the Remand Order, the Appeals Council concluded that "[s]ubstantial evidence does not support the [ALJ]'s [RFC] for the entire period at issue, particularly the standing, walking, and postural limitation." (Tr. 173). In reaching this conclusion, the Appeals Council noted that, "[i]n support of the [RFC] finding in this case, the [ALJ] gave weight to the medical source opinions of James Seely, M.D.," but such statements did "not represent his own opinion about [the plaintiff's] work-related abilities[,]" but rather, were based on the plaintiff's "own reports about what [he could] do." (Tr. 173). Additionally, the Appeals Council observed that the postural, standing and walking limitations suggested by Dr. Seely and adopted by the ALJ were "not consistent with the record as a whole[.]" (*Id.*).[2]

In light of the foregoing, the Appeals Council directed the ALJ, upon remand, to

> [o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 C.F.R. 404.1512 and 416.912). **The additional evidence shall include updated evidence from the claimant's treating sources, if available, and an updated consultative physical examination, if further warranted, with medical source statements about what the claimant can still do despite the impairments.**

(Tr. 175) (emphasis added).

The Appeals Council's directive was the result of its conclusion that the record lacked evidence from which the ALJ could determine what the plaintiff could still do despite his impairments. In his first decision, the ALJ assigned "great weight" to both of Dr. Seely's Medical Source Statements (*see* Tr. 163, citing Tr. 845-52, 861-68), which the Appeals Council found was error given that those statements of the plaintiff's limitations were based on the plaintiff's self-

---

[2] The Appeals Council also directed the ALJ, on remand, to further evaluate the plaintiff's work and earnings record (*id.*), which the ALJ did. (Tr. 17-18). The plaintiff does not identify any error with the ALJ's compliance with this this portion of the Remand Order.

6

reports.[3] Accordingly, the Appeals Council ordered the ALJ to gather additional evidence from which the ALJ could formulate the plaintiff's RFC. The Remand Order explained that this evidence would include "updated evidence from the claimant's treating sources, if available, and an updated consultative physical examination, if further warranted, with medical source statements about what the claimant can still do despite the impairments." (Tr. 175). In response to this order, the ALJ obtained further treatment notes, consisting of physical therapy records from February to April 2018, medical records from Yale-New Haven Hospital from January 2016 through April 2018 and from Fair Haven Community Health Center from July 2017 to June 2018, which included some additional records from Dr. Seely. (*See* Tr. 917-1038). This medical record evidence is of the same quality as the evidence before the ALJ when he issued his first decision, meaning that it consisted of treatment records. None of the additional records include medical source statements,

---

[3] On June 1, 2016, Dr. Seely completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) in which he opined that the plaintiff could frequently lift up to ten pounds, occasionally lift up to twenty pounds, and never lift over twenty pounds. (Tr. 846). He could continuously carry up to ten pounds, frequently carry up to twenty pounds, occasionally carry up to fifty pounds, and never carry more than fifty pounds. (Tr. 846). Dr. Seely noted that, "from patient's report of what he can do[,]" the plaintiff could sit for twenty minutes, stand for thirty minutes, and walk for ten minutes at a time, or the length of a city block, with a cane, without interruption. (Tr. 847). Additionally, he could frequently operate foot controls with either foot (Tr. 848), and, "[b]y [patient] report[,]" he could occasionally climb stairs and ramps, and occasionally balance, but could never climb ladders and scaffolds, stoop, kneel, crouch or crawl. (Tr. 849). Dr. Seely reported that the plaintiff could perform activities of daily living, except he could not walk a block at a reasonable pace on rough or uneven surfaces and could not put his socks on. (Tr. 851).

On May 19, 2017, Dr. Seely completed a second Medical Source Statement of Ability to do Work-Related Activities (Physical) in which he noted, as he had in 2016, "Infor[mation] as reported by patient." (Tr. 861 (emphasis in original)). Dr. Seely noted the same assessment of the plaintiff's ability to lift and carry, although he emphasized that the plaintiff could lift from "2 feet above the floor only." (Tr. 861 (emphasis in original)). He also noted that the plaintiff could sit for one hour at a time without interruption and could stand for fifteen minutes or walk for ten minutes. (Tr. 862). The plaintiff used a cane and could not "walk safely at all without risk of falling." (Tr. 862 (emphasis in original)). He wrote that the plaintiff's right elbow would get "stuck in flexion at times[,]" and his "hands [would] go numb with prolonged reaching." (Tr. 863). According to Dr. Seely, the plaintiff could drive, but his driving was limited because he could not grip the steering wheel for more than a few minutes. (Tr. 863). He assessed the plaintiff as capable of performing all of the activities listed in the Medical Source Statement. (Tr. 866).

In each of these records, Dr. Seely notes that the conclusions as to what the plaintiff could and could not do were based on the plaintiff's own reporting.

7

consultative examinations, or any updated evidence from the claimant's treating sources that detailed what the plaintiff could still do despite his impairments.

The plaintiff argues that the Appeals Council "ordered the ALJ to either order a consultative examination or obtain . . . an updated opinion from [the plaintiff's] treating physician." (Pl.'s Mem. at 10). The defendant contends, however, that the plaintiff "mischaracteriz[es]" the Appeals Council's order as the ALJ "was not required to obtain either a consultative examination or an updated opinion from [the plaintiff's] treating physician." (Def. Mem. at 9).

While both parties rely on different excerpts from the Appeals Council's Remand Order, there is no shortage of explanation from the Appeals Council of its rationale in remanding this case back to the ALJ. In addition to relying on the content of the Remand Order, the Court has thoroughly reviewed the Appeals Council's notice of action ["Notice"], dated October 6, 2017. (Tr. 229-37). In its Notice, the Appeals Council stated its intention to issue a remand order

> [i]nstruct[ing] the [ALJ] to obtain evidence about your work and earnings to determine whether you have performed substantial gainful activity since your alleged disability onset date; **obtain updated evidence from your treating sources, if available; and obtain a consultative physical examination, if warranted.**

(Tr. 234). The Appeals Council continued,

> We also will instruct the [ALJ] to take the following actions: further evaluate the opinion evidence of record; reassess your maximum [RFC] for the entire period at issue and provide rationale with citations to specific evidence in support of the assessed limitations; further evaluate the consistency of your statements about your symptoms and limitations; and obtain supplemental vocational expert evidence to determine the effect of your assessed limitations on your ability to perform your past relevant work or other work that exists in significant numbers in the national economy.

(Tr. 234). Thus, the Appeals Council remanded the case, as stated in its Remand Order, to secure evidence of what the plaintiff could still do despite his impairments. The Appeals Council made

8

it clear that such evidence could be in updated medical records, updated medical opinions, and/or a consultative examination.

Although the ALJ received additional medical records, none of those records provided evidence of what the plaintiff could still do despite his impairments. Moreover, in his decision, the ALJ referred to the medical opinions of record from the plaintiff's treating physician, Dr. Seely, but these were the same opinions that pre-dated the Remand Order, which the Appeals Council concluded could not be relied upon as Dr. Seely noted that assessments were based on the plaintiff's self-reports. The absence of a statement of what the claimant could do despite his impairments resulted in a gap in the record that the Appeals Council sought to remedy. The Appeals Council remanded the case and ordered the ALJ to secure additional evidence, including medical opinions, if necessary, which would establish what the plaintiff could still do despite his impairments. The ALJ failed to follow the Appeals Council's directive. To compound this error, the ALJ referred to Dr. Seely as an "examining, non-treating" source, when, in fact, Dr. Seely was a treating provider, whose assessments and opinions, as discussed below, are subject to the treating physician rule. (Tr. 17).

The Regulations clearly require an ALJ to take any action that is ordered by the Appeals Council. *See* 20 C.F.R. § 404.977(b) (stating that an "administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."). The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand. *Ellis v. Colvin*, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014); *Savino v. Astrue*, No. 07–CV–4233 (DLI), 2009 WL 2045397, at *9 (E.D.N.Y. July 8, 2009) (citing *Scott v. Barnhart*, 592 F. Supp. 2d 360, 371 (W.D.N.Y. 2009) ("The ALJ's failure to comply with the Appeals Council's order constitutes

legal error, and necessitates a remand.") (additional citation omitted); *Mann v. Chater*, No. 95 CIV. 2997(SS), 1997 WL 363592, at *1–2 (S.D.N.Y. June 30, 1997) (holding that the case must be remanded when the ALJ did not follow the orders of the Appeals Council)).

In this case, the ALJ's refusal to comply with the Appeals Council's order constitutes legal error and precludes a finding by this Court that the ALJ's findings were supported by substantial evidence.

B. TREATMENT OF DR. SEELY'S OPINION

The plaintiff also argues that the ALJ erred in referring to Dr. Seely as an examining, non-treating physician (Pl.'s Mem. at 3) and failed to mention Dr. Seely in relation to any of the treatment notes upon which the ALJ relied. (Doc. No. 23 at 1-2). Moreover, the plaintiff asserts that, even if the ALJ had considered Dr. Seely as the plaintiff's treating physician, he failed to properly weigh the opinion with the other factors found in the treating physician rule. (Doc. No. 23 at 2). The defendant counters that the ALJ appropriately weighed Dr. Seely's opinion under the treating physician rule and that the ALJ's reference to Dr. Seely as a non-treating physician was merely a scrivener's error as he was aware, from plaintiff's testimony, and from review of the medical records, of the plaintiff's treatment history with Dr. Seely. (Def.'s Mem. at 3-7).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence

supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion."). "A failure by the Commissioner to provide 'good reasons' for not crediting the opinion of a treating physician is a ground for remand." *Hanes v. Comm'r of Soc. Sec.*, No. 11-CV-1991 (JFB), 2012 WL 4060759, at *12 (E.D.N.Y. Sept. 14, 2012) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

The plaintiff's treatment history with Dr. Seely at Fair Haven Community Health Center for back pain and diabetes dates back to October 8, 2013. (*See* Tr. 420). Even if the Court accepts the defendant's claim that the ALJ's reference to Dr. Seely as an "non-treating" physician was scrivener's error, the ALJ erred in his consideration of the Dr. Seely's treatment records and their consistency with the rest of the evidence.

As an initial matter, the ALJ erred in his conclusion that "[t]he record does not show any limitations with elbow range of motion." (Tr. 17). Dr. Seely's treatment records explicitly contradict this statement and address the plaintiff's elbow limitations. (Tr. 420 (10/8/13: the plaintiff reported that his elbows "g[o]t 'stuck'"), Tr. 538 (2/8/16: unable to fully extend either elbow)), Tr. 420, 538). The ALJ's erroneous treatment of Dr. Seely's reports does not end there. In addition to treating the plaintiff for elbow pain, Dr. Seely treated the plaintiff for his lower back and knee pain and, at least initially, for diabetes, before referring him to Bala Sivaramakrishnan, RN, for obesity and diabetes management. (*See e.g.* Tr. 425-28, 432, 977-85, 991-96, 998-1005,

11

1011-13, 1033-34). The ALJ, however, assigned "partial" and "limited" weight to the opinions of Dr. Seely on the basis that the reports relied on the plaintiff's own reports, the reports were not supported by clinical findings, and the reports did not correspond to the findings in the record. (Tr. 17). The ALJ, however, did not consider a great deal of the medical evidence of record, nor did he consider the consistency of Dr. Seely's findings with other medical evidence.

In his decision, the ALJ focused on the notations in the record of normal range of motion, to the exclusion of entries reflecting limited range of motion in the plaintiff's knees and lower back. (Tr. 16-17). Specifically, the record reflects that on January 21, 2014, Dr. Seely noted the plaintiff's "[l]imited range of motion flexion at knees and lower back (unable to reach floor)," and in December 2014, the plaintiff reported to Dr. Seely that his back pain was "worst over [his] sacral spine." (Tr. 429, 440; *see* Tr. 429-31). Dr. Seely prescribed a muscle relaxant, Cyclobenzaprine, for his back pain. (Tr. 444). Approximately three weeks later, on January 26, 2015, the plaintiff began physical therapy at Yale-New Haven Hospital, which he attended regularly until discharge on March 31, 2015. (Tr. 558; *see* Tr. 551-711, 724-71). His physical therapist noted that the plaintiff had a nine-year history of chronic low back pain due to a weak core, morbid obesity, a slouched sitting posture, and decreased lumbar lordosis. (Tr. 554; *see also* Tr. 560, 598-99, 609, 618, 627, 638, 647, 656, 659, 663, 670, 671, 675, 683, 684, 688, 692, 697, 700, 705, 737, 740, 743, 746, 748, 751, 754, 759, 762, 764, 767). Her notes reflect that an abdominal x-ray from 2013 revealed "some sacralization of L5 on S1." (Tr. 554). He reported difficulty bending, putting on socks and cutting toe nails, and pain when he gets up, bends, stands or walks "a lot." (Tr. 555; *see also* Tr. 54, 58 (the plaintiff's testimony that he could not fully bend, was unable to put on shoes that require fastening, and was unable to bend over to put on socks)). Upon examination, the plaintiff had a short, flat-foot gait with "decreased single leg stance time

bilaterally"; he was tender to palpation at L4-S1 at the spinous processes; and, consistent with Dr. Seely's findings, the plaintiff had a limited range of motion of his trunk with a mild impairment of his right lower extremity. (Tr. 556; *see id.* ("Impairments found: gait; mobility; muscle strength; ROM [range of motion]; pain; posture")).[4]

On January 28, 2015, the plaintiff returned to Dr. Seely, complaining of back pain that was worse with walking or with prolonged (10-20 minutes) sitting; he could stand for "a bit longer." (Tr. 448). At that time, Dr. Seely noted a normal range of motion, and he "stressed" to the plaintiff that he must continue physical therapy. (Tr. 450). He prescribed Tramadol and Meloxicam, and he opined that the pain in the plaintiff's feet was "likely sciatica extending to [his] feet[,]" rather than plantar fasciitis. (Tr. 450).

Physical therapy notes from March and early May 2015 reflected improvement, and as the ALJ appropriately noted, the plaintiff's pain decreased, although he had difficulty bending to pick things up from the floor. (Tr. 637, 646; *see also* Tr. 665 & 684 (3/19/19: "some improvement in ROM"), 676 (3/17/19 ("making progress with strength and his pain is decreasing"); *see* Tr. 54-55 (the plaintiff testified he cannot bend from a seated position to pick an object up off the floor)). However, as of May 8, 2015, the plaintiff reported that physical therapy had not helped, and that, since his last appointment, his feet hurt and he could not walk for a month, until the pain resolved. (Tr. 457).

On May 31, 2015, the plaintiff was seen at the emergency department for knee pain. (Tr. 771). At that time, he was working at a car wash. (Tr. 771). His right knee had a normal range of motion, but there was isolated tenderness to the right quadriceps tendon, and some pain with

---

[4]The physical therapy notes reflect consistently that the plaintiff was morbidly obese, with a slouched posture, and a decreased lumbar lordosis. (Tr. 560, 599, 609, 618, 627, 638, 647, 656, 659, 663, 670, 671, 675, 683, 684, 688, 692, 697, 700, 705, 737, 740, 743, 746, 748, 751, 754, 759, 762, 764, 767). On February 4, 2015, it was also noted that the plaintiff had a decreased cadence and an antalgic gait. (Tr. 576; *see also* Tr. 581, 585, 591).

13

extension and flexion. (Tr. 773). Four months later, on September 18, 2015, the plaintiff complained that his back pain was "getting worse in [that] past week[,]" and that he could not exercise due to that pain. (Tr. 468). A month later, the plaintiff expressed that he was "upset about his continuing back pain, and not being able to overcome [it.]" (Tr. 470). Dr. Seely prescribed Tramadol for the plaintiff's bilateral low back pain with left-sided sciatica. (Tr. 530).

On January 4, 2016, the plaintiff treated with Andrew Mark Berliner, DPM for his bilateral foot pain. (Tr. 524). Dr. Berliner diagnosed the plaintiff as diabetic with "developing neuropathy." (Tr. 524). On January 31, 2016, the plaintiff reported to the emergency department for this bilateral foot pain. (Tr. 492 *see also* Tr. 797-98, 950-52). Upon examination, the plaintiff exhibited tenderness to the distal plantar surface; he was diagnosed with diabetic neuropathy and was advised to take a higher dose of Lyrica. (Tr. 494, 799, 952; *see also* Tr. 499 (tenderness in the left and right feet)).

On February 8, 2016, the plaintiff returned to Dr. Seely. (Tr. 537). He reported feeling better on Lyrica but that his prescription ran out and he wanted to increase the dose. (Tr. 537). Dr. Seely noted that the plaintiff's back pain "somewhat improved[]"; upon examination, he was "[u]nable to fully extend either elbow[,]" with "[l]imited flexion of [his] right elbow." (Tr. 538). On March 30, 2016, the plaintiff complained of "high stress due to his back pain, and not being able to do many of the things he would like to." (Tr. 869). On April 12, 2016, the plaintiff reported persistent back and neck pain, and some numbness and tingling in his right leg in the mornings. (Tr. 871). Two weeks later, he continued to complain of back and knee pain. (Tr. 873). On May 6, 2016, Dr. Seely noted that the plaintiff was working as a mechanic and was unable to pick up tools when he dropped them. (Tr. 874). He reported also "[s]ome weakness and numbness in [his] fingers." (Tr. 874).

The plaintiff underwent an x-ray of his lumbar spine on May 27, 2016, which revealed "multilevel degenerative disc disease with large bridging osteophytes at L3-L4[,]" and "[f]acet arthropathy of the lower lumbar spine." (Tr. 821). The x-ray also revealed that the alignment was anatomic. (Tr. 821). The plaintiff was seen in the emergency room on May 30, 2016 for left knee pain that he experienced for several months but that had worsened in the past few days. (Tr. 800-03, 953-56). There was "no laxity" and pain "laterally [with] pivoting." (Tr. 802, 955). On June 1, 2016, Dr. Seely noted again that the plaintiff had decreased range of motion in his back. (Tr. 877).

On September 22, 2016, the plaintiff returned to Dr. Seely who noted, upon examination, that the plaintiff had a decreased range of motion in his back. (Tr. 885). He diagnosed the plaintiff with uncontrolled type 2 diabetes with diabetic neuropathy, with long-term current use of insulin; morbid obesity with BMI of 40.0-44.9; dyslipidemia; essential hypertension; chronic bilateral low back pain with left-sided sciatica; elevated TSH; and fatigue. (Tr. 887). On November 8, 2016, the plaintiff reported that he could not walk "much" due to back pain, and he "admit[ted] to high stress due to his back pain[.]" (Tr. 890).

On November 21, 2016, the plaintiff returned to Dr. Berliner for his bilateral neuropathy. (Tr. 892). Dr. Berliner diagnosed the plaintiff with pre-ulcerative calluses, peripheral neuropathy with evidence of callus formation of either foot, and he determined that the plaintiff needed diabetic shoes. (Tr. 892)

. The plaintiff was seen by Dr. Seely on January 5, 2017 for knee pain and pain in the soles of his feet. (Tr. 895). Dr. Seely noted "[n]o palpable abnormality of [the] right knee[.]" (Tr. 896). The plaintiff's coincident treatment with Dr. Berliner is consistent with his complaints to Dr. Seely.

On March 31, 2017, the plaintiff complained of persistent back pain (Tr. 899), and a week later, the plaintiff returned to Dr. Seely to report continued back pain that was not alleviated by physical therapy. (Tr. 853, 900). The plaintiff reported also a numbness in his arms that Dr. Seely believed was related to the plaintiff's neck problems. (Tr. 900). Dr. Seely diagnosed the plaintiff with chronic bilateral low back pain with left-sided sciatica. (Tr. 853). The plaintiff was referred to an orthopedic surgeon for a consultation. (Tr. 857).

He was seen at the emergency department on April 16, 2017 for complaints of "constant" right knee pain that was "worsening." (Tr. 803). The plaintiff ambulated with a cane, and the emergency room notes, consistent with other entries in the record, reflected that the plaintiff had a decreased range of motion and that his knee was tender upon examination, specifically in the patellar tendon. (Tr. 804, 806). X-rays revealed calcification of the infra and suprapatellar ligament. (Tr. 806; *see* Tr. 822). Similar to the emergency department records, when the plaintiff returned on May 19, 2017, Dr. Seely noted that the plaintiff walked with a cane, stood slowly, and had "some discomfort." (Tr. 906).

As the more recent treatment records reflected, the plaintiff received two lidocaine injections from Elizabeth Roessler, a PA at Fair Haven Community Health Care, in June and November 2017 for tenderness at the medial joint line and lateral joint line of the plaintiff's right knee. (Tr. 914-15, 996-97).[5] On February 5, 2018, the plaintiff returned for another injection in his right knee. (Tr. 1009). Consistent with reports reflected in Dr. Seely's records, the plaintiff stated that he occasionally had a sensation that his right knee wanted to "buckle" while walking.

---

[5] The references in May 2016 and August and November 2017 to the plaintiff working as a mechanic, and at a car wash, respectively (Tr. 874, 982), may be inconsistent with the plaintiff's reports of pain and limitation. The possible inconsistencies make a functional assessment and opinion of what the plaintiff could and could not do despite his impairment all the more important in order for the ALJ to reach a decision supported by substantial evidence in the record.

16

(Tr. 1009). He was diagnosed with patellofemoral arthralgia of the right knee and referred for physical therapy rather than given another injection. (Tr. 1010).

On February 14, 2018, the plaintiff started orthopedic aquatic physical therapy. (Tr. 920, 923). The plaintiff reported that he ambulated with a cane because his knee had given out occasionally. (Tr. 921). He had a "[s]light decrease" in his right knee "patellar mobility . . . medially and laterally[,]" and "significantly poorer quad control on the [right] compared to the [left], likely contributing to his pain." (Tr. 922; *see also* Tr. 923). The plaintiff was seen on February 20 and 22, and on February 27, 2018, he noted his back was "really hurting but his knee [felt] mildly better." (Tr. 926-28). On March 1, 2018, the plaintiff had difficulty with right sided tandem stance and balancing. (Tr. 918, 929). He was seen five days later (Tr. 930), and again on March 8, 2018, at which time he "tolerated increased reps with increased difficulty of balance[,] . . . with no issues on stairs." (Tr. 931). On March 15, 2018, he was able to "progress to dynamic balance exercise with no increase in pain[.]" (Tr. 932). He reported that his knees felt "the same but [his] back [was] bothering [him] a lot more now." (Tr. 933). As of his assessment on March 16, 2018, the plaintiff was functionally limited, with decreased transfer ability, decreased standing tolerance, decreased ambulation tolerance, decreased sitting tolerance, decreased ability to complete activities of daily living, decreased activity level, and increased back pain with aquatic therapy. (Tr. 935). On this same day, the plaintiff reported to Dr. Seely that his back pain was much worse when he climbed stairs. (Tr. 1019). Once again, Dr. Seely found that the plaintiff had a decreased range of motion of his back with tenderness to palpation at the superior and inferior edges of the right patella. (Tr. 1019). On March 20, 2018, the plaintiff reported that he was unable to complete his exercise program because he was living in his truck. (Tr. 938). His knees felt sore and his back continued to hurt. (Tr. 938).

17

The plaintiff returned to physical therapy six days later (Tr. 940-41), and on March 30, 2018, the plaintiff reported to Dr. Seely that he was sleeping in his car. (Tr. 1024). Dr. Seely observed that the plaintiff rose from sitting slowly with some discomfort and ambulated with a cane. (Tr. 1024). On April 5, 2018, the plaintiff complained that he felt his knee pain was getting worse. (Tr. 942). He reported that he was "all done with therapy[,]" as he could barely walk after the last session. (Tr. 942). His provider noted that he had increased his knee flexion range of motion and improved his strength. (Tr. 944).

On April 27, 2018, the plaintiff returned to the emergency department for his knee pain. (Tr. 969). The provider noted a history of back pain, and upon examination, noted tenderness in the left knee, as well as limited range of motion due to pain. (Tr. 971). An x-ray of the plaintiff's right knee was "unremarkable[,]" with "some evidence of arthritic changes without significant effusion." (Tr. 971; *see* Tr. 973-75). He was diagnosed with arthritis. (Tr. 972).

On April 30, 2018, the plaintiff returned to Dr. Seely for his knee pain. (Tr. 1028). The plaintiff reported that his knee pain had worsened, and that he thought the physical therapy was the cause. (Tr. 1028). Dr. Seely noted that the plaintiff walked with a cane and rose with "significant discomfort." (Tr. 1029). Dr. Seely referred the plaintiff for another injection for his knee (Tr. 1030), which was done on June 4, 2018. (Tr. 1035). At that time, the plaintiff had difficulty with weight bearing on his right knee and walked with a cane. (Tr. 1036).

In his decision, the ALJ reported the normal findings, while disregarding the limitations noted by Dr. Seely and the consistency of his records with other evidence demonstrating the plaintiff's limited range of motion. Additionally, although the ALJ appropriately discounted Dr. Seely's medical source statements on the ground that some of the findings therein relied "solely on the claimant's report[,]" the ALJ erred in failing to seek a medical source statement or

consultative examination, consistent with the Appeals Council's remand order. As the plaintiff testified (Tr. 49), Dr. Seely treated the plaintiff for at least ten years, during which, as discussed above, he objectively noted decreased range of motion in the plaintiff's lower back, limitations in the plaintiff's elbows, limitations with the plaintiff's knees, the use of a cane for ambulation, and difficulty rising from a seated position. Yet, the ALJ discounted Dr. Seely's findings as unsupported by the record.

Moreover, the ALJ lacked medical records, medical opinions, or a consultative examination that detailed what the plaintiff could do despite his impairments. The Appeals Council recognized this gap and remanded the case to remedy this issue. The ALJ's error in failing to follow the Remand Order of the Appeals Council is compounded by the ALJ's treatment of Dr. Seely's opinions, which should have been considered in conjunction with the additional evidence obtained pursuant to the Remand Order. Accordingly, upon remand, the ALJ shall comply with the Appeals Council's Remand Order, consider the plaintiff's treating physician's records and new opinions, if any, in accord with the Regulations, hold a new hearing, and issue a new decision.

### C. THE ALJ'S CONSIDERATION OF THE PLAINTIFF'S DIABETES AND NEUROPATHY

The plaintiff argues that the ALJ's RFC finding was a product of legal error and was unsupported by substantial evidence because he failed to properly consider the symptoms of the plaintiff's diabetes and neuropathy, which the ALJ concluded were severe impairments. (Pl.'s Mem. at 8-10). In light of the remand ordered above, the ALJ will hold a new hearing and issue a new decision in which all of the plaintiff's impairments, addressed in the treating physician records and by the medical source statement or consultative examination obtained on remand, will be considered. Accordingly, the Court need not address this issue.

## VI. CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 19) is GRANTED such that this case is remanded consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 22) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 7th day of January, 2020 at New Haven, Connecticut.

    /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge